# BURROUGHS INTERNATIONAL COMPANY
## *v.* DATRONICS ENGINEERS, INC.

[No. 310, September Term, 1968.]

*Decided June 27, 1969.*

328

*Motion for rehearing filed July 28, 1969; denied September 8, 1969.*

The cause was argued before HAMMOND, C. J., and MARBURY, BARNES, FINAN, SINGLEY and SMITH, JJ.

*Edward B. Layne, Jr.,* with whom were *McInerney, Latham & Layne* on the brief, and *John L. Vanker, Jr.,* with whom were *Butzel, Earman, Long, Gust & Kennedy* on the brief, for appellant.

*Jules Fink,* with whom were *Isadore B. Katz, Sylman I. Euzent, Euzent, Katz & Fink, Stevan M. Katz* and *Harry S. Wender* on the brief, for appellee.

SINGLEY, J., delivered the opinion of the Court.

This controversy is an entirely typical aftermath of the corporate merger or take-over which has become commonplace in our business community. It brings before us for interpretation that portion of an agreement for the sale of the stock of Strand Engineering Company (Strand) in which the seller, Datronics Engineers, Inc. (Datronics), warranted to the purchaser, Burroughs International Company [1] (Burroughs), that the liabilities of

---

1. The Agreement of purchase and sale was actually between Burroughs Control Corporation and Datronics. It appears from the record that Burroughs International Company is the corporate

Strand as of 30 June 1962 would not exceed its assets by more than $220,000 and provided how any such excess would be treated. Unhappily, the resolution of the problem calls for an involuntary excursion into the *terra incognita* known to accountants as *GAAP* (generally accepted accounting principals). As Judge Henry J. Friendly wisely observed, "* * * Accounting concepts are a foreign language to some lawyers in almost all cases, and to almost all lawyers in some cases." [2]

Strand, incorporated in Michigan, had outstanding 6,000 shares of common stock, $10 par, all of which were owned by Datronics. Strand's corporate career had been something less than successful: at 30 June 1962, it had an accumulated deficit of some $140,000, even after capitalizing "Patent Development and Application Costs" of some $311,000 and goodwill at $43,000. Its current liabilities were almost twice its current assets, and operating losses for the month of June, 1962 had been some $27,000. We can only judge that it was being kept alive by liberal infusions of cash, which appear to have amounted to more than $200,000, from Datronics, its parent.

Into this desperate situation came Burroughs. After what we can only assume to be protracted negotiations, on 13 August 1962, Burroughs and Datronics entered into an agreement (the Agreement) under which Burroughs agreed to purchase and Datronics agreed to sell the 6,000 shares of Strand stock owned by Datronics for $183,600 in cash and 3,410 shares of the common stock of Burroughs Corporation.[3] As will be later explained, the stock was given an "agreed" value of $40 per share and was to be placed in escrow to secure the performance by Datronics of the representations, warranties and covenants contained in the Agreement.

The Agreement is a typical example of the sophisticated draftsmanship customarily encountered in such

---

successor of Burroughs Control Corporation, and it is so treated in this opinion.

2. In *United States v. Kovel*, 296 F. 2d 918 (2d Cir. 1961) at 922.

3. Presumably the parent of Burroughs International Company.

transactions. Its provisions are unremarkable, except that it provided for closing at 3 P.M. on the day it was executed, thus denying Burroughs any opportunity to make an independent inquiry into Strand's affairs prior to the closing date. This is a possible reason for the escrow arrangement.

The provisions of the Agreement which are relevant to the present controversy are these:

"1. Seller represents and warrants that:

\* \* \*

"(e) The unaudited Balance Sheet of Strand as at June 30, 1962, the unaudited Profit and Loss Statement of Strand for the month of June, 1962, and the four months ended June 30, 1962, the unaudited Balance Sheet of Seller as at June 30, 1962, and Seller's unaudited Profit and Loss Statement for the five months ended June 30, 1962, copies of all of which have heretofore been furnished by Seller to Purchaser and are attached hereto as Exhibits 1, 2, 3 and 4, respectively, and made a part hereof, are correct and truly and fairly present the results of the operations of Strand and Seller for the respective periods covered thereby, and their financial condition as of the ends of such period, except that Seller makes no representation or warranty as to the value, if any, of the assets designated 'Other Assets' [4] on Strand's Balance Sheet as at June 30, 1962. Said Profit and Loss Statements and Balance Sheets were prepared in accordance with generally accepted principles of accounting, consistently maintained by Strand and Seller throughout the periods stated.

"Since June 30, 1962, there have been no changes in the assets, liabilities or condition, financial or otherwise, of Strand or Seller, ex-

4. These consisted of patent development and application costs of $311,670.16 and goodwill carried at $43,000.

cept as consented to in writing by Purchaser and except changes arising from transactions in the ordinary course of business and none of such changes have been materially adverse. Since June 30, 1962, neither the business nor any of the properties of Strand or Seller have been substantially and adversely affected in any way by any cause whatsoever, including, but in nowise limited to, act of God, fire, explosion, earthquake, accident, strike, lockout, combination of workmen, flood, drought, embargo, riot, condemnation, confiscation, activities of Armed Forces or order of the United States of America, any of the several States, or municipalities thereof, or any department, agency or commission of any of them. The Seller further expressly represents, warrants and covenants that to the extent the total liabilities of Strand, actual and contingent, exceed the total assets of Strand (excluding 'Other Assets' of $354,670.16) as of June 30, 1962, by an amount greater than Two Hundred Twenty Thousand Dollars ($220,000.-00), as determined by generally accepted principles of accounting, the Purchaser may, without limiting its other remedies, charge any such excess against the Escrow hereinafter provided."

\* \* \*

"(n) Strand is the owner of all of the outstanding capital stock of Automatic Controls Corporation, a Michigan corporation, which corporation is solvent and has a net worth of not less than $3,000.00; and Strand will deliver to Purchaser as an enclosure to the Letter a true and correct Balance Sheet of said corporation as at July 31, 1962; and Seller warrants that the assets and liabilities shown on said Balance Sheet will not be adversely affected prior to Closing."

\* \* \*

"11. All of the covenants, representations and warranties of the parties hereunder shall survive the Closing Date subject to performance under this Agreement."

Attached to the Agreement as Exhibit 1 was the unaudited balance sheet of Strand as at 30 June 1962. This showed that Strand's assets, after deducting "other assets" of $354,670.16 referred to in paragraph 1(e) of the Agreement, were $266,856.12 and that its liabilities were $485,723.45. Liabilities therefore exceeded assets by $218,867.33 but this excess was $1,132.67 less than the representation that liabilities at 30 June 1962 would not exceed liabilities as at that date, "determined by generally accepted principles of accounting" by an amount greater than $220,000.

There is no doubt that the seller of shares of corporate stock may warrant that the financial condition of the corporation is that represented by financial statements, or guarantee that the corporation has no indebtedness or that the indebtedness does not exceed a certain amount. 12 A Fletcher, *Private Corporations* § 5615 (1957) at 247, 252. Agreements containing warranties substantially similar to those of the Agreement have been before the courts in *Collings v. Bush Mfg. Co.*, 256 F. 2d 573 (2d Cir. 1958) ; *Automatic Canteen Co. of America v. Butler*, 177 So. 2d 712 (D.Ct.App. Fla., 1965) ; *Adzigian v. W O R L Broadcasting Corp.*, 348 Mass. 777, 202 N.E.2d 915 (1964) ; *Carolet Corp. v. Garfield*, 339 Mass. 75, 157 N.E.2d 876 (1959) ; *Consolidated Freightways Corp. v. Wilhelm*, 238 Ore. 518, 395 P. 2d 555 (1964) ; *In re Carter*, 390 Pa. 365, 134 A. 2d 908 (1957).

It will be remembered that the Agreement provided that 3,410 shares of Burroughs Corporation stock were to be placed in escrow. The escrow agreement, executed at the closing, provided, in part:

"5. [Burroughs] and Datronics agree that:
(a) They shall jointly order the Escrow Agent to deliver to [Burroughs] such stock (in-

cluding dividends paid thereon), at an agreed value of Forty Dollars ($40.00) per share, as is necessary to hold [Burroughs] harmless from Datronics' breach of any of the representations, warranties, covenants, terms or provisions of said Agreement of Sale dated August 13, 1962; and

(b) Except as provided in paragraph 5(a) hereof, [Burroughs] and Datronics agree that they shall jointly order the Escrow Agent to deliver said stock to Datronics as follows:

(i) One Thousand (1,000) Shares on September 15, 1962;

(ii) Five Hundred (500) Shares on October 15, 1962;

(iii) Five Hundred (500) Shares on November 15, 1962;

(iv) Five Hundred (500) Shares on December 15, 1962; and

(v) Nine Hundred Ten (910) Shares on December 15, 1963;

Provided, however, that if at any time in the good faith opinion of [Burroughs] it appears that Datronics has breached or threatens to breach any of the representations, warranties, covenants, terms or provisions of said Agreement of Sale dated August 13, 1962, [Burroughs] may refuse to execute such joint order to the Escrow Agent with regard to such shares not then delivered to Datronics which are deemed by [Burroughs] necessary to secure itself against loss resulting from said breach or threatened breach.

(c) In the event either [Burroughs] or Datronics shall refuse to execute such joint order directing said Escrow Agent to deliver said stock to [Burroughs] or Datronics, the Escrow Agent shall continue to hold such stock not previously delivered pursuant hereto, until such

joint order is obtained or until otherwise directed by court order.

(d) Dividends on all Burroughs Corporation Common Stock held by the Escrow Agent shall be delivered to said Escrow Agent to be held and delivered by it to [Burroughs] or Datronics under the same conditions and at the same time as the shares on which such dividends have been declared are delivered."

It would appear that Burroughs, from and after the closing, assumed the active management and direction of Strand and devoted a year or more to an independent examination of its affairs. 2,500 of the Burroughs Corporation shares held in escrow were released to Datronics during the period 15 September 1962 to 15 December 1962, as provided by subparagraphs 5(a) (i) through (iv) of the escrow agreement. When it came time to release the remaining 910 shares on 15 December 1963, Burroughs refused to join in an authorization to release, claiming that it had the right under the Agreement to assert a claim of $91,044.93 against the escrowed shares.

When Burroughs and Datronics failed to reach agreement, Burroughs instituted suit against Datronics and the escrow agent in the Circuit Court for Montgomery County, claiming that an audit had disclosed that the liabilities of Strand, as at 30 June 1962, exceeded its assets by $91,045 more than the $220,000 maximum represented by the agreement; that judgment for $91,045 and costs should be entered in its favor against Datronics; and that $36,400 of the judgment be satisfied by the entry of an order directing the escrow agent to deliver to Burroughs the 910 shares of Burroughs Corporation stock which remained in escrow. The escrow agent deposited the stock which it held and the dividends which it had received with the registry of the court, and thereafter took no part in the proceeding.

Burroughs' original claim, actually in the amount of $91,044.93, was reduced at trial by a stipulation that $21,-

684.48 represented an account or accounts receivable not properly chargeable against the escrow. The trial court found that there had been a further reduction of $5,-537.64, consisting of adjustments made by Burroughs' witnesses. Consequently, at the conclusion of the trial, the court was dealing with a revised claim of $63,822.81. It allowed all of the adjustments made by Burroughs' auditors except four which aggregated $41,902.84. With the elimination of these, adjustments totalling $21,919.97 remained. The court entered judgment in Burroughs' favor against Datronics in the amount of $21,920 and directed that this be satisfied by the delivery to Burroughs of 548 of the escrowed shares of Burroughs Corporation stock, which, at $40 per share, had a value precisely equivalent to the amount of the judgment. The order also provided that the 362 shares remaining be delivered to Datronics. Under the order, each party was to receive the dividends which had accumulated on its shares.

Neither party was satisfied with the result: Burroughs, because $41,902.84 of the adjustments which it had claimed had been disallowed; Datronics, because Burroughs had been allowed to make any adjustments at all. Burroughs, treating the judgment of 20 March as a judgment nisi entered in accordance with Maryland Rule 564 b 1,[5] filed a motion for a new trial as provided by Rule 567 a. On the same day, Datronics filed a "Motion for Reconsideration", which we will consider to the extent that it extended the time within which Datronics could appeal, as a motion for a new trial. The court denied both motions by order entered 3 May 1968. We will regard this denial as equivalent to the entry of a judgment absolute from which an appeal may be taken. *Merlands Club, Inc. v. Messall,* 238 Md. 359, 362-63, 208 A. 2d 687 (1965).

Both parties appealed. Counsel for Datronics, at argument before us, conceded that the proceeding below was in the nature of a declaratory action and suggested that,

---

5. Which provides, "Where an action at law is tried upon the facts by the court, the court shall direct judgment *nisi* to be entered upon the law and the evidence."

if there had been error in the declaration below, both parties were agreed that it could readily be corrected by us on the record before us without remand.

The thrust of Burroughs' appeal is that the court's refusal to allow the four adjustments totalling $41,902.84 constituted reversible error. Datronics, on the other hand, vigorously attacks the propriety of the adjustments which the court permitted and denies that any additional ones are justifiable.

Burroughs rests its case on the interpretation to be given Datronics' representation and warranty that: (i) the balance sheet of 30 June 1962 is correct, was prepared in accordance with generally accepted principles of accounting, and truly and fairly presents the financial condition of Strand as at that date; and (ii) from 30 June 1962 to 13 August 1962 (the date of the Agreement) there had been no changes in the financial condition of Strand, except those arising in the ordinary course of business, which had not been materially adverse.[6]

Datronics says, on the other hand, that "[t]here is not a scintilla of evidence to show that Strand's [Acquisition] Balance Sheet was not prepared in accordance with generally accepted principles of accounting."

We shall consider these contentions, and later, the other points made by Datronics in the context of Maryland Rule 886 a: where a case has been tried below without a jury, we may review the case on the law and the evidence, but will not set aside the judgment of the lower court on the evidence unless it is clearly erroneous, *Space Aero Products Co. v. R. E. Darling Co.*, 238 Md. 93, 208 A. 2d 74 (1965), and the evidence must be viewed in the light most favorable to the party prevailing below, *Goodwin v. Lumbermens Mut. Cas. Co.*, 199 Md. 121, 85 A. 2d 759 (1952):

"* * * Before a determination can be made that

6. Datronics says that the argument in (ii) was not made below and cannot be urged for the first time on appeal. We need not consider this point, since as we see it warranty (i) is dispositive of the issue.

such a decision is clearly erroneous, the evidence must be viewed in a light most favorable to the prevailing party below. If, viewed in that light, there is substantial evidence to support the factual conclusion, then the appellate court should accept that conclusion. But if there is no such substantial evidence, then the conclusion may be designated as arbitrary, and may be disregarded. If the trial court does not say what it finds to be the facts, no presumption as to them arises merely from the decision. Obviously, then, if there is no factual statement or conclusion, there is no reason for the appellate court to examine the record with an evidentiary slant in favor of the appellee in order to sustain a non-existent presumption." 199 Md. at 129-30.

We now turn to a detailed consideration of the disputed adjustments.

### (i)

American Radio Telephone Company—$15,205.98

Among the accounts receivable included in the 30 June 1962 balance sheet was an amount of $15,205.98 representing the total of three invoices issued by Strand for design services performed under an American Radio Telephone Company purchase order. Performance of the contract was terminated on 17 January 1962 at American Radio Telephone's instruction. There was testimony that by May 1962, the controller of Strand knew that American Radio Telephone was "near the bankruptcy stages." The account had been placed for collection in the hands of Strand's attorneys who, on 28 May 1962, had recommended the rejection of a $3,500 settlement offer because they believed that a substantially greater amount could be obtained. Burroughs produced testimony that sound accounting principles would have demanded that Strand's 30 June balance sheet set up a 100% reserve against this account. Datronics' expert testified that there was insufficient evidence to justify a 100% write-off and

that there was some evidence that a substantial distribution might be received in bankruptcy. The court below declined to allow the $15,205.98 adjustment on the ground:

> "No proof was ever established that the account was without value, so there was not a decrease in accounts receivable as of the date of the acquisition, even though there was no provision for bad debts on the books of the Strand Company. No convincing testimony was adduced to establish that the lack of such a reserve was not in accordance with generally accepted accounting principles. Rather than accounting, this would appear to be a business judgment. There was also some indication in the file that the American Radio Telephone Company, upon liquidation, would be able to pay a substantial part of the Strand claim."

The point here, of course, is that Datronics did not, by signing the Agreement, guarantee the collectibility of Strand's accounts receivable. The real question is whether, as a matter of accepted accounting principles, the receivable was properly treated in the balance sheet. As to this, the experts disagreed. Based on our review of the evidence, we cannot say that the lower court's conclusion was clearly erroneous. The court could properly find, as it did, that under all the circumstances the adjustment was not properly allowable.

### (ii)

Bendix Systems Division—$586.28

The 30 June 1962 balance sheet included an account receivable from Bendix Systems Division in the amount of $2,598.97 for services rendered during the period 1-28 February 1961. Of this amount $586.28 was disputed by United States government auditors, and an amended billing was submitted by Strand after the take-over to correct a "clerical error". Since the 30 June 1962 balance

sheet reflected no such error, the lower court, we think quite properly, allowed Burroughs an adjustment of $586.28.

### (iii)

Parke, Davis & Company—$5,250

This amount represents a 10% retention on a $52,500 purchase order under which Strand undertook to develop a capsule testing machine for Parke, Davis & Company. Prior to 30 June 1962, the machine had been returned for adjustment, and additional work was done for Parke, Davis by Strand after Strand had been acquired by Burroughs. Burroughs billed Parke, Davis approximately $17,000 for this additional work, and the bill was paid. The court below declined to permit Burroughs to claim an adjustment for the $5,250 retained by Parke, Davis without giving us the benefit of its precise reasons. We regard the result reached as correct, however. At the time that Burroughs acquired Strand, the machine was still being reworked. If and when the machine could be delivered in condition satisfactory to Parke, Davis, the $5,-250 would have been clearly collectible. It would appear that Burroughs followed an alternative course: it had Strand continue to engage in development work for Parke, Davis, and there is no evidence that an invoice was ever issued for the $5,250 retained by Parke, Davis. It cannot complain of the consequences of the choice which it made.

### (iv)

Parke, Davis & Company—$7,474.20

This item was a strange by-product of the transaction described in (iii). When Parke, Davis returned the machine to Strand to be reworked in April of 1962, it issued a purchase order in the amount of $3,000 for additional work, and that sum was ultimately paid. By 30 June 1962, the amount which Strand had expended in performance of the purchase order had exceeded the $3,000 limit by $7,474.20. The controller of Strand gave instructions not to "book" the item, and it was carried on the 30 June balance sheet as "inventory".

The lower court rejected the adjustment claimed by Burroughs, and said:

> "[This] cannot be considered as an adjustment, since business relationships existed between Strand and Parke-Davis after the acquisition for many months which included billing and payments on many items, and to allow adjustment to inventory of $7,474.20 as requested would be sheer speculation."

As we see it, the lower court was in error here. The expert witnesses for both Burroughs and Datronics were dubious about the validity of the accounting treatment given this item. To include in inventory an amount which Strand had expended but which Parke, Davis was not obligated to pay was an obvious distortion of Strand's financial condition, and the adjustment should have been allowed.

### (v)

Automatic Controls Corporation—$2,306.90, $3,167.56 or their sum, $5,474.46

Included in the 30 June 1962 balance sheet as an "investment" was Datronics' interest in Automatic Controls Corporation, a wholly owned subsidiary, at $3,167.56. Automatic Controls was, in fact, insolvent, and there was testimony that it cost Burroughs $2,306.90 to dispose of it, the validity of such payment being disputed by Datronics. Expert witnesses for both parties testified that the attribution of a value of $3,167.56 [7] to an asset known to have no value was not in accord with sound accounting practices. The court allowed Burroughs a credit of $2,306.90 (the disputed cost of disposing of the interest) which we find puzzling, and apparently also allowed a credit of $3,167.56 to correct the over-statement of value.

---

7. The testimony seems to indicate that this figure would have been $2,500 higher, except that in preparing the balance sheet, $2,500 was transferred from "investment" to "cash" to conceal an overdraft in the cash account.

It seems to us that the proper adjustment was limited by the extent to which the balance sheet reflected a value which simply was not there, or $3,167.56. The fact that Burroughs spent $2,306.90 to dispose of the stock seems to us of no consequence, particularly when there is no evidence whatsoever that such an expenditure was required to satisfy a liability not reflected in the balance sheet. Accordingly, the credit of $2,306.90 should not have been allowed.

### (vi)

Langs, Molyneaux and Armstrong—$5,426.40

Langs, Molyneaux and Armstrong, a Detroit law firm, represented Strand. The balance sheet of 30 June 1962 reflected a $957.90 account payable to the firm, but failed to reflect an invoice for $5,426.40 sent to Strand on 8 June 1962. The court below allowed Burroughs an adjustment in the amount of the invoice. Datronics now complains that there is no proof that the work was done or that the charge was reasonable and that Burroughs' duty to mitigate damages requires such a showing. The answer, of course, is that Datronics either retained the firm or acceded to its employment. The work was done while Datronics controlled Strand. If it had any complaint, it should have caused inquiry to be made on receipt of the 8 June invoice. Because Strand's balance sheet failed to reflect the charge which had accrued, the allowance of $5,426.40 was proper.

### (vii)

Grundy, Schroeder & Company—$2,750

Grundy, Schroeder was Strand's accountant prior to the take-over. In September 1962, it billed Strand $2,750 for accounting services rendered during Strand's fiscal year ended 28 February 1962. Burroughs claimed, and the court properly allowed, an adjustment in the amount of the invoice, since the bill had not been paid by Strand, nor had the liability been reflected in the 30 June 1962 balance sheet. While there is some suggestion in the tes-

timony that the bill may have covered work done for Automatic Controls, the bill was addressed to Strand and was approved for payment by the individuals who had been Strand's president and auditor. Under such circumstances, Burroughs was under no obligation to question it. If there was a duty to mitigate damages, it fell on Datronics.

### (viii) and (ix)

Charles L. and Mary M. Langs—$13,972.66;

Charles L. and Mary M. Langs—$6,000

These two items relate to payments made by Strand to Charles L. and Mary M. Langs. A charge of $13,972.66 was made against Strand's bank account on 2 July 1962 by debit memorandum, and a check for $6,000 was issued by Strand on 5 July 1962. It should be noted that (i) the payments were made by Strand subsequent to the date of the 30 June 1962 balance sheet; (ii) the liability was not reflected in the balance sheet; and (iii) the payments were made prior to the execution of the Agreement on 13 August 1962. There was evidence that the amounts represented payments made to the Langs for their services in personally guaranteeing loans made by National Bank and Trust Company of Ann Arbor, Michigan, to Strand, in amounts of $75,000 on 5 May 1962 and $60,000 on 5 June 1962, which were secured by its accounts receivable and which enabled Strand to meet payrolls. An additional $60,000 appears to have been loaned on 5 July which may have made possible the payments to the Langs. Burroughs claimed an adjustment for both items. The court below allowed the $6,000 payment, but declined to adjust for the $13,972.66 payment, explaining:

> "Therefore, while it is clear that Mr. Langs was paid for guaranteeing bank loans in May and June of 1962, only the sum of $6,000 covering payrolls can be allowed as a proper item. There was testimony as to a loan of $75,000 but interest on $75,000 for a period of May and June,

1962, cannot be related to an item of $13,972.66, and this adjustment cannot be allowed."

We take a somewhat different view of the matter. It will be recalled that in 1(e) of the Agreement, Datronics warranted that:

"The unaudited Balance Sheet of Strand as at June 30, 1962 * * * [is] correct and truly and fairly present[s] * * * [its] financial condition as of the [end] of such period. * * *"

Burroughs makes the significant comment in its brief that 30 June 1962 was a Saturday and 2 July 1962 a Monday, so that the $13,972.66 payment at least must have been made while figures for the 30 June balance sheet were being assembled. Apart from this, however, a balance sheet which failed to disclose an accrued liability of $19,972.66 cannot be said to "truly and fairly present the financial condition" of Strand if for no reason other than the materiality of the amount. Strand had borrowed most of the money prior to 30 June and it would be sheer fatuity to assume that it was unaware of the circumstances which surrounded the loans. We think the entire adjustment of $19,972.66 should have been allowed.

### Summary

The court below entered judgment in Burroughs' favor for $21,920. The record does not clearly establish that either the Burroughs' audit or the court took into account the fact that on 30 June 1962, Strand's liabilities exceeded its assets by $218,867.33, and that the Agreement provided that there could be charges made against the escrow account only to the extent that liabilities exceeded assets by more than $220,000. Consequently, the judgment must be reduced by $1,132.67 (the difference between $218,867.33 and $220,000.00) and further reduced by the $2,306.90 adjustment described in (v), which we think was improperly allowed. On the other hand, it must be increased by the $7,474.20 credit described in (vi) and by the additional adjustment of $13,972.66 dis-

cussed in (viii). The resulting amount is $39,927.29, for which judgment should have been entered.

### Datronics' Cross Appeal

We have heretofore considered Datronics' contentions with respect to the several items for which Burroughs sought adjustments.

Datronics would have us rule that it is entitled to a credit against any adjustments which may be allowed Burroughs for income tax benefits which Burroughs may derive from Strand's operating loss carry-forward of $140,840.33 and from the amortization of research and development expenses of some $129,082. Datronics' expert witness, John W. Coughlan, testified in support of this contention, and Datronics' counsel refers us to Opinions of the Accounting Principles Board of the American Institute of Certified Public Accountants, Vol. 11, December, 1967 at 172-74. The lower court, perhaps influenced by the fact that there was testimony that Burroughs had actually realized no tax benefit, rejected this argument, relying on the general rule that damages, if they are to be allowed, must be reasonable and certain and may not be based on speculation or conjecture.

We too reject the contention, but for a wholly different reason. The simple answer to the argument is that the Agreement provided for no such treatment of possible tax benefits. Not having contracted for a post-closing adjustment of purchase price predicated on tax advantages to be achieved by Burroughs, Datronics cannot claim it now whether or not Burroughs avails itself of the benefits. What may be good accounting practice in setting up a possible tax benefit as an asset on the books of a purchased subsidiary cannot be read into the terms of a contract of sale.

Datronics finds considerable discomfiture in the fact that the 910 shares of Burroughs Corporation stock remaining in escrow have a present value of about $260 per share. We quote paragraph 3(a)(ii) of the Agreement, providing for the delivery of the 3,410 shares of

Burroughs Corporation stock which constituted a portion of the consideration which Burroughs paid for the Strand stock:

> "Said stock so delivered to the Escrow Agent shall have an agreed value of Forty Dollars ($40.00) per share for the purpose of this Agreement and the Escrow Agreement."

The Escrow Agreement contained an undertaking by Burroughs and Datronics that:

> "They shall jointly order the Escrow Agent to deliver to [Burroughs] such stock (including dividends paid thereon), at an agreed value of Forty Dollars ($40.00) per share, as is necessary to hold [Burroughs] harmless from Datronics' breach of any of the representations, warranties, covenants, terms or provisions of said Agreement of Sale dated August 13, 1962; * * *."

Datronics struggled valiantly—and unsuccessfully — below to persuade the court that any judgment entered against it should be satisfied in cash, and not first from the escrowed shares of Burroughs Corporation stock at the agreed value of $40 per share. It will fare no better here.

At argument before us and below, it was explained that the Burroughs Corporation shares had been arbitrarily assigned a value of $40 for purposes of the Agreement and the escrow agreement in order to assist Datronics in solving some of its own problems.[8] Entirely apart from this, however, Datronics cannot have it both ways. It is not difficult to imagine the consternation which would have resulted had Burroughs, in a rising market, insisted on substituting cash for the shares re-

---

8. There is a suggestion that the sale of the Strand stock at a lower price would have resulted in the insolvency of Datronics.

leased from time to time to Datronics by the escrow agent.

We have treated under (vi) and (vii) Datronics' contention that Burroughs failed in its duty to mitigate damages. We are not persuaded by Datronics' argument that the court erred in admitting Strand's financial records into evidence and that there is not "a scintilla of evidence" that Strand's balance sheet was not prepared in accordance with generally acceptable principles of accounting.

As to the first contention, Maryland Code (1957, 1965 Repl. Vol.) Art. 35, § 59 provides for the admission into evidence of any record made in the regular course of business. The purpose of the statute was the liberalization of the narrow common law rules, *Morrow v. State*, 190 Md. 559, 562, 59 A. 2d 325 (1948), and to end the restriction that the person whose testimony is received should speak from personal observation or knowledge, *Bethlehem-Sparrows Point Shipyard, Inc. v. Scherpenisse*, 187 Md. 375, 381, 50 A. 2d 256 (1946). The critical evidential document in this case was Burroughs' audit report, the admission of which was sponsored by Burroughs' witness, Read Peirce, the general auditor of Burroughs, under whose supervision the audit was made. Underlying this audit were the records and papers of Strand, which were retained by Strand after the take-over and found there by Mr. Peirce. It was these records, identified by Peirce as part of his working papers, which were admitted by the trial court over the vigorous and repeated objections of Datronics. We cannot say that the lower court's admission of these subsidiary records was erroneous. Art. 35 § 59 clearly provides that "[a]ll other circumstances of the making of such writing or record * * * including lack of personal knowledge by the entrant or maker, may be shown to affect the weight, but not the admissibility thereof." Datronics never questioned the authenticity of the records, and in fact used them in the examination of its own witness. As the lower court pointed out, they were admitted not for their truth,

which was not contested, but in support of the audit. The rule in Maryland is that business records may be introduced, even though hearsay in nature, when the entry meets the test of "necessity and circumstantial guaranty of trustworthiness". *Smith v. Jones,* 236 Md. 305, 309, 203 A. 2d 865 (1964) ; *Morrow v. State, supra.* In this case the elements of necessity and circumstantial guaranty were clearly present.

As to the second contention, Burroughs' expert witness, James T. Malone, testified twice without objection that the adjustments which were proposed by the Burroughs audit were necessary, in his opinion, to bring the 30 June 1962 balance sheet into conformity with generally accepted accounting principles. It is true, as Datronics insists, that its witness, Mr. Coughlan, carefully avoided the use of the phrase "generally accepted principles of accounting" and talked instead of the "basic standards of fairness and accuracy" and "various errors" which may "misstate assets, liabilities or equity." As we interpret the Agreement's warranties, the distinction which Mr. Coughlan sought to draw certainly offers little solace to Datronics. More than ample support can be found for the proposition that generally accepted accounting principles (GAAP) are nebulous in concept and almost incredibly elastic. Grady, *Inventory of Generally Accepted Accounting Principles for Business Enterprises* (AICPA Accounting Research Study No. 7, 1965) at 51-52 has compiled a list of some 30 instances where alternative and divergent treatment can be accorded accounting problems, yet each variant can be supported as being consistent with GAAP. Graham, *Some Observations on the Nature of Income, Generally Accepted Accounting Principles, and Financial Reporting,* 30 Law and Contemporary Problems 652 (1965) at 666 comments at length on the efforts of the profession to bring order out of this thicket of uncertainty. There is no doubt that the underlying philosophy can be identified in the phrase Mr. Coughlan chose, "basic standards of fairness and accuracy". To the extent that Strand's 30 June 1962 balance

sheet failed to meet this standard, Burroughs is entitled to recover.

> *Judgment modified; judgment entered in favor of Burroughs International Company against Datronics Engineers, Inc. in the amount of $39,927.29, of which amount $36,400 shall be satisfied by the transfer and delivery to Burroughs International Company of 910 shares of the stock of Burroughs Corporation now held in the registry of the court together with all dividends which have accrued thereon at the agreed value of $40 per share; costs of this appeal and below to be equally divided between the parties.*