STATE OF MARYLAND, DEPARTMENT OF GENERAL
SERVICES *v.* ROGER E. HOLTMAN
& ASSOCIATES, LTD.

[No. 101, September Term, 1982.]

*Decided August 9, 1983.*

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

*Allan B. Blumberg, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General,* and *Paul S. Sugar, Assistant Attorney General,* on the brief, for appellant.

*Standish McCleary, III,* with whom was *Edward L. Blanton, Jr.,* on the brief, for appellee.

MURPHY, C. J., delivered the opinion of the Court.

Chapter 450 of the Acts of 1976, now codified as Maryland Code (1957, 1981 Repl. Vol.), Article 21, §§ 7-101 to 7-104, prohibits the State of Maryland, among other governmental entities, from asserting the defense of sovereign immunity "in an action in contract based upon a written contract executed on behalf of the State." Section 6 of the statute (not

codified) provides that the statute "shall not apply to any action based on a contract entered into or executed prior to the effective date of this Act." The statute became effective July 1, 1976. Whether the contract sued upon in this case is subject to the provisions of the statute is the issue now before us for decision.

(1)

Roger E. Holtman, a landscape architect and site planner, contracted with the State on May 26, 1971 to perform work at Towson State College (now University). The contract was printed on the State's "Standard Form of Agreement with Architects or Engineers." It recited that the State had $5,000 available "for the purpose of Quadrangle Site Development Study to Develop Schematic Plans for Phase I of the Educational Street Concept" at the college. The contract identified the "scope of the said project" in the same terms, specifying that it was "per proposal dated May 5, 1971." [1] The contract price was not to exceed $5,000.

The agreement contained six printed parts, the first of which specified that the Architect/Engineer services would consist of three separable principal divisions, viz:

> "(1) the preparation and furnishing of approval sketches to be known as the Preliminary Phase, (2) the preparation and furnishing of contract documents for the receiving of bids and their analysis to be known as the Working Drawing Phase and (3) the supervision of the construction of the project to be known as the Supervision Phase."

The remaining provisions of Part I of the agreement impose various conditions and requirements upon the architect or engineer with respect to the manner in which the work must be performed. Part II of the contract outlines certain obligations imposed upon the State. Part III deals with

---

1. This "proposal" is not a part of the record in this case.

"Ownership of Documents" prepared by the architect or engineer. Part IV concerns "Fees and Payments" for the three phases of the work described in Part I, as may be applicable. Part V sets forth "Special Provisions" of the contract, including a clause that claims or disputes shall be subject to arbitration in accordance with the Standard Form of Arbitration Procedure of the American Institute of Architects; the provision recites that arbitration is "a condition precedent to any right of legal action that either party may have against the other." The arbitration provision further specifies that it may not be construed as a surrender or waiver of the State's sovereign immunity "in the event that suit is instituted against the State ... arising out of the matters dealt with under this contract." The arbitration clause also provides that

> "[a]ll money awarded against the State ... will be collectible only after approval of said award by the State Board of Public Works under an applicable appropriation."

Part VI of the Standard Agreement sets forth a "Schedule of Architectural and Engineering Fees" for services as detailed in Part I of the contract.

Holtman completed the project undertaken under the 1971 agreement and was paid in full for his services. By letter dated October 13, 1972, the State requested Holtman to undertake additional work, in the amount of $45,000, in designing and preparing detailed plans and specifications "for Phase I, II and III" of the Educational Street Concept at Towson State College. The letter referred to the Standard Form of Agreement dated May 26, 1971 and stated that the additional work to be undertaken by Holtman was an "EXTENSION" of that earlier agreement. The letter contained a directive to Holtman that should he accept the State's proposal, he should affix a copy of the letter "to your parent agreement." Holtman agreed to perform the work, indicating his acceptance by signing the letter agreement.

In October of 1973, Holtman incorporated his business under the name Roger E. Holtman & Associates, Ltd. (Holtman). The corporation assumed Holtman's individual obligations and by October of 1974 completed the work contemplated by the October 13, 1972 letter agreement. Payment in full for the services rendered was made by the State.

By letter dated November 5, 1976, the State requested Holtman to undertake additional work on Phase I, II and III of the Educational Street Concept at Towson State University. The letter referred to the October 11, 1972 agreement and asked that Holtman consider it as an "EXTENSION" of the "Agreement" in the lump sum amount of $40,373, to do the following work:

> "for Preparation of detailed plans and specifications for revisions and completion of contract documents turnarounds at four locations, retaining walls, pathways, plaza paving, amphitheatre, Cook Library forecourt, overall landscaping, site grading, area lighting, benches and street furniture, including bidding phase for work, and supervision of project work, shop drawing inspection and project follow-up required by consultants, and as-built topographic survey. Included in this fee is a direct payment of $3,200.00 for payment to a land surveyor who will be employed by the Landscape Architect."

The letter directed that should Holtman sign the new letter agreement, a copy should be affixed to "your parent agreement." Holtman agreed to undertake the additional work by its signed acceptance of the State's proposal.

The last work performed by Holtman under the November 5, 1976 letter agreement was completed in August of 1980. A dispute arose as to the amount of compensation due Holtman under the contract and it requested the State to agree to arbitration. In so agreeing, the State informed Holtman of its position that the three segments of their

agreement constituted but one unitary contract; that any money awarded against the State by the arbitrator was collectible only after the Board of Public Works approved the award under an applicable appropriation; that arbitration was not binding upon either party but was simply a condition precedent to either party's right to proceed against the other in court; and that in agreeing to submit to arbitration the State did not agree to abide by the arbitration award and reserved the right, should Holtman pursue its claim in court, to defend the action on grounds of sovereign immunity.

On September 29, 1980, the arbitrator awarded Holtman the sum of $64,587.50 for its services under the contract and assessed arbitration expenses against the State in the additional amount of $1,142. The State declined to pay the award and Holtman petitioned the Circuit Court for Baltimore County for confirmation of the arbitration award or, in the alternative, for judgment on its contract claims. The State filed a motion raising preliminary objection, asserting the defense of sovereign immunity from suits seeking money damages. The trial court granted the State's motion and dismissed the suit. Holtman appealed. The Court of Special Appeals reversed the trial court's order and remanded the case for a hearing as to the confirmation of the arbitration award; it found that Art. 21, § 7-101 applied to the 1976 letter agreement, thus preventing the State from pleading sovereign immunity. *See R. E. Holtman & Assoc. v. Dep't Gen. Serv.,* 52 Md. App. 213, 447 A.2d 503 (1982). We granted certiorari to resolve the issue presented in the case.

(2)

The State argues that the Standard Form Agreement of May 26, 1971, together with the letter contract extensions of October 13, 1972 and November 5, 1976, constitute but a single unitary contract, which was executed prior to July 1, 1976 and therefore the contract is not subject to the statutory abrogation of the sovereign immunity defense. The State submits that its Standard Form Agreement is used to

retain design services of architects and engineers; that it provides a framework for the contracting parties to proceed in a step-by-step fashion from the beginning of a project to its conclusion; that the 1971 Standard Form Agreement in this case allowed the contracting parties to commence a project with only one step and thereafter to add steps when it became feasible to do so; that the Standard Form Agreement divided the work which Holtman agreed to undertake into several phases; that because it frequently takes several years from the preliminary design of a project through its construction, two practical reasons required such a "phase-in" of the work, *i.e.,* (1) so as to provide review checkpoints and a method to evaluate the amount of compensation due Holtman in any phase of the project and (2) to provide convenient stopping points if State funds were not immediately available to proceed to the next phase. The State says that although the 1971 Standard Form Agreement with Holtman was so structured as initially to be limited to the Preliminary Phase of the work, nevertheless Holtman agreed to a contract that anticipated its extension to include the latter two phases of the work.

Notwithstanding the State's assessment of the purpose and effect of its Standard Form Agreement, we conclude, in the circumstances of this case, that the letter agreement of November 5, 1976 constituted a separate contractual undertaking which, while connected with the earlier agreements of May 26, 1971 and October 13, 1972, was legally independent of both. As we see it, the case before us is a simple one. It requires a determination of whether, within the contemplation of the legislature in enacting § 7-101 of Art. 21 waiving the State's sovereign immunity in contract actions, the letter agreement of November 5, 1976, upon which suit was here instituted, was "a contract entered into or executed" before July 1, 1976.

In *John McShain, Inc. v. State,* 287 Md. 297, 411 A.2d 1048 (1980), it was contended that, as a matter of law, a pre-July 1, 1976 contract, amended after that date by several "change order" modifications, constituted a new contract

within the protection of the statute. We there said that the legislature did not contemplate any such legal formulation as the test by which to determine whether the contract was "entered into or executed" before or after July 1, 1976. Rather, we said, the legislature intended that the statute be given a purely prospective application, "measured by the commencement date of the contract sued upon, determined as a matter of fact." 287 Md. at 301. Because the action in *McShain* was based on a pre-July 1, 1976 agreement, and none of the damages claimed were predicated on a breach of a provision in the contract inserted by amendment after July 1, 1976, we concluded that assertion of the sovereign immunity defense was not inconsistent with the dictates of the statute.

The letter agreement of November 5, 1976 was not a mere amendment to the Standard Form Agreement. Neither the State nor Holtman had any contractual responsibility to undertake any additional work under the Standard Form Agreement after the actual work contracted for in that document had been completed. The contractual undertaking assumed by Holtman under the 1971 agreement was simply to develop, for the contract price of $5,000, schematic plans for Phase I of the Educational Street Concept at the college. The greatly enlarged scope of the work covered by the letter agreements of October 13, 1972, and November 5, 1976 encompassed the design and preparation of detailed plans and specifications for Phases I, II and III of the project for contract prices, respectively, of $45,000 and $40,373. Merely to label the letter agreements as "extensions" of the Standard Form Agreement does not constitute them as part of a single unitary contract executed on May 26, 1971, as the State contends. Nor does any such result flow from the mere identification of the Standard Form Agreement as the "parent" agreement, or from the mere commonality of the three agreements to the single project undertaken at the college. Indeed, the letter agreement of November 5, 1976 was with a party different from that which had executed the Standard Form and 1972 letter agreements. In any event,

we think that by executing the letter agreements the parties intended that the applicable provisions of the Standard Form Agreement would be extended into, and made part of the incorporated subsequently assumed contractual obligations. In other words, the "boilerplate" and other applicable provisions of the Standard Form Agreement, as heretofore set forth, were intended by the parties to be carried forward and imported into the later executed letter agreements, as if fully set forth therein. As a matter of fact, therefore, the commencement date of the contract sued upon in this case was November 5, 1976 and is thus within the protective ambit of the statute. *McShain, supra,* 287 Md. at 301.

We therefore conclude that the Court of Special Appeals correctly determined that the trial judge erred in sustaining the State's preliminary objection and dismissing the case on sovereign immunity grounds. On remand, the trial court will be required to consider whether, *inter alia,* the petition to confirm the arbitration award should be granted. In addressing this issue, the provisions of §§ 7-101 to 7-104 must be considered as part of the November 5, 1976 letter agreement under the familiar principle that subsisting laws enter into and form part of a contract as if expressly referred to or incorporated in its terms. *See Wilmington Trust Co. v. Clark,* 289 Md. 313, 424 A.2d 744 (1981), and *Beca v. City of Baltimore,* 279 Md. 177, 367 A.2d 478 (1977). Thus, any provisions of the November 6, 1976 letter agreement which are manifestly inconsistent with §§ 7-101 to 7-104 must yield to the public policy expressed by the legislature in enacting the statute. Manifestly, the arbitration provisions contained in the Standard Form Agreement (and incorporated into the letter agreements), which disavow any waiver of the State's sovereign immunity, are without effect and the State is accordingly restricted from raising or relying upon that defense. Similarly circumscribed is the arbitration provision which permits collection of the arbitration award only upon approval of the Board of Public Works under an applicable appropriation. Section 7-104

directs the Governor to include adequate funds in the State budget to satisfy any final judgment obtained against the State in a contract action. Collectibility under the statute does not, therefore, depend upon prior approval by the Board of Public Works. Of course, the validity of the State's interpretation of the non-binding nature of the arbitration provisions is a matter for the trial court's consideration on remand.

*Judgment affirmed, with costs.*