622 A.2d 206

**I.A. CONSTRUCTION CORPORATION**

v.

**EQUIPTEC, INC.**

**No. 1015, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

April 2, 1993.

Robert L. Walsh, Silver Spring, for appellant.

Paul J. Mraz, Elkton, for appellee.

Argued before GARRITY, FISCHER and DAVIS, JJ.

GARRITY, Judge.

In this matter we are asked to decide whether the trial court erred in entering a Final Order Establishing a Mechanic's Lien and Directing Sale of Property in favor of appellee Equiptec, Inc. (Equiptec) and against certain land and the improvements thereon owned by appellant I.A. Construction Corporation (I.A. Corp.).

## BACKGROUND

Appellant, I.A. Corp., contracted with Gencor, its general contractor, to build an asphalt plant from used components at I.A. Corp.'s Delmar, Maryland facility. Gencor, in turn, sub-contracted with Equiptec, an erection company of asphalt plants and general structures. Essentially, I.A. Corp. and Gencor were to supply the plant and necessary materials, Gencor was to oversee the erection of the plant, and Equiptec was to supply all of the labor for the construction of the plant to be used to manufacture asphalt.

Under paragraph two of the contract, Equiptec had the duty to "erect the hot elevator, dryer, bag house and mirror filler bin along with related components." The parties disputed whether "related components" included the hook-up of the air lines to the valve that controlled the flow of asphalt between the asphalt tank and a lesser capacity asphalt bucket. The issues presented in this case center around the installation of the air lines, specifically, whether

Equiptec had a contractual duty to install the air lines, whether Equiptec negligently installed the air line valve, and whether the incorrect hook-up of the air lines caused an asphalt spill that occurred shortly after start-up of the plant.

After construction of the plant had proceeded significantly, Gencor supplied Equiptec with a "punch list" of items that remained uncompleted. The punch list did not include hooking up air lines to a certain three-way valve. In order to facilitate completion of the punch list items, Equiptec assigned two workers to complete the project: a welder and an unskilled laborer.

At some point thereafter, a Gencor supervisor (Troy Morrison) advised the unskilled laborer (George Black), who had no previous experience hooking up this type of air line system, how to hook-up the air lines. At a later point in time, the supervisor ordered the laborer to hook-up the lines to the valve. Unfortunately, the laborer connected the air lines incorrectly.

Managers for Equiptec were not informed of the need to connect the air lines or otherwise asked to assist in such installation of the lines to the three-way valve. Mr. Joseph Pecht, Jr., an on-site overseer employed by Equiptec, was, however, aware that Mr. Morrison had instructed Mr. Black how to connect the air lines to the valve. The Gencor supervisor, Mr. Morrison, did not check to see if the lines had been connected properly.

The system was designed to run with the valve controlling the air lines in a closed position so that the hot liquid asphalt would circulate within the plant from the heated asphalt tanks, past the air lines and then back into the top of the tanks. If the valve controlling the air lines was open, asphalt would not circulate but rather would be pumped through the air lines and into the "AC bucket" that had the capacity to hold 1,000 gallons of asphalt. A safety cut-off switch in the bucket is designed to shut off the supply pump when the bucket is full of asphalt.

Gencor, while trying to meet a start-up deadline of April 15, 1991, started the asphalt supply pump on April 13, 1991, but it stalled out because the hot oil exchange system, which is supposed to heat the various pipes and ensure that the hot asphalt remains in an easily flowing liquid form, was inadequate. Gencor then substituted another pump, the "unloading pump," to circulate the hot asphalt through the lines to keep them hot for use the next day. One of the ramifications of using this pump was that the safety cut-off switch in the AC bucket could not staunch the flow of asphalt from the unloading pump in the event the bucket filled. According to testimony given by a Gencor supervisor, the spill would not have occurred if the unloading pump had not been substituted for the regular supply pump.

Evidence established that, prior to initiating the start-up of the plant, Gencor did not thoroughly inspect the plant or check to ensure that the air lines had been connected correctly. Immediately after starting the plant, Gencor personnel left the plant unattended for nine to ten hours and before leaving did not check to see if the heated asphalt was recirculating properly. Gencor did not notify Equiptec of the start-up of the plant, and none of Equiptec's personnel were present when the plant was started.

At some point after start-up, approximately 6,000 gallons of hot asphalt fed through the air lines into the AC bucket and out onto the ground. The cost to clean up the spilled asphalt totalled $45,576.65.

The trial court, faced with conflicting evidence regarding the meaning of the contract, the alleged negligence of the various parties, and the causes of the asphalt spill, entered judgment in favor of Equiptec for a mechanic's lien in the amount of $54,227.67.

The court found that Equiptec had met its burden of proving that it was due $54,227.67 under the contract for work it had performed. This finding is not challenged on appeal.

The trial court then addressed I.A. Corp.'s claim to a set-off in the amount of $45,576.65. The court determined that I.A. Corp. was not entitled to a set-off for this amount because 1) I.A. Corp. failed to produce sufficient evidence to convince the court that Equiptec had a contractual duty to hook-up the air lines, 2) that the Equiptec employee who installed the air line valve was acting at the direction of Gencor, not Equiptec, and 3) that the spill was due in large part to Gencor's negligence during the start-up of the plant.

## QUESTIONS PRESENTED

We are asked to address a number of questions on appeal, including:

1. Whether Equiptec had a contractual duty to hook-up the air line valve.
2. Whether Equiptec was solely responsible for negligently installing the air line valve.
3. Whether Equiptec's negligent actions directly and proximately caused the liquid asphalt spill at the asphalt plant.
4. Whether the trial judge erred in hearing the claim due to "unclean hands" on the part of Equiptec.

## ANALYSIS

In an action that has been tried without a jury, we review the case on both the law and the evidence. We will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and we must give due regard to the opportunity of the trial court to judge the credibility of witnesses. Md.Rule 8–131(c).

### I.

In seeking to offset the costs of cleaning-up the asphalt spill against the amount otherwise due Equiptec for work done under the contract, I.A. Corp. sought first to prove that Equiptec had a contractual duty "to hook-up the air lines." Paragraph 2 of the contract provided that

Equiptec would "erect the hot elevator ... along with related components." Brian Pecht, the general superintendent for Equiptec who signed the contract on behalf of Equiptec, initially maintained that the contract did not include connection of the air lines to the valve, but on cross-examination conceded that such activity was included under the term "related components." Troy Morrison, the supervisor for Gencor, with significant experience in the erection of asphalt plants, testified that hooking up the air lines fell under "related components."

■ The contract was drafted by Equiptec. Ambiguities in the interpretation of the contract should be resolved against the drafter. *Truck Insurance Exchange v. Marks Rentals, Inc.*, 288 Md. 428, 418 A.2d 1187 (1980). Although not determinative as to the final responsibility for the asphalt spill, we believe that the contract imposed a duty upon Equiptec to install the air hoses properly as part of its construction of the plant.

## II.

■ The second issue we shall address arises out of the trial court's finding that the negligence of Equiptec's employee in installing the air lines should be imputed to Gencor since the employee acted at the direction of Gencor rather than at the direction of Equiptec.

There is no question that George Black, an unskilled laborer employed by Equiptec to assist in completing certain remaining punch list items at the plant, incorrectly installed the air line. It is also undisputed that Black completed this task after receiving instruction from Morrison. While Joseph Pecht, Jr., the on-site overseer for Equiptec, was aware that Morrison of Gencor was giving Black instructions concerning the. hook-up of the air lines, there was never any discussion or agreement between Gencor and Equiptec regarding Black's status as a borrowed servant.

At trial, Equiptec successfully used the borrowed servant doctrine defensively to shift liability for Black's negligence onto Gencor by arguing that Black was controlled by Gencor when he installed the air lines.

An oft cited case discussing the principles behind the borrowed servant doctrine is *Standard Oil Co. v. Anderson*, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480 (1909). In that matter, the Supreme Court held:

It sometimes happens that one wishes a certain work to be done for his benefit, and neither has persons in his employ who can do it nor is willing to take such persons into his general service. He may then enter into an agreement with another. If that furnishes him with men to do the work, and places them under his exclusive control in the performance of it, those men become pro hac vice the servants of him to whom they are furnished. But, on the other hand, one may prefer to enter into an agreement with another that that other, for a consideration, shall himself perform the work through servants of his own selection, retaining the direction and control of them. In the first case, he to whom the workmen are furnished is responsible for their negligence in the conduct of the work, because the work is his work, and they are, for the time, his workmen. In the second case, he who agrees to furnish the completed work through servants over whom he retains control is responsible for their negligence in the conduct of it, because, though it is done for the ultimate benefit of the other, it is still, in its doing, his own work. To determine whether a given case falls within one class or the other we must inquire whose is the work being performed,—a question which is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work. *Here we must carefully distinguish between authoritative direction and control, and mere suggestion as to details or the necessary cooperation, where the work furnished is part of a larger undertaking.* *Id.* at 221–222, 29 S.Ct. at 254. (Emphasis added).

In determining whether a master servant relationship exists, the Court of Appeals has set forth five criteria that should be considered. These include (1) the selection and engagement of the servant, (2) the payment of wages, (3) the power to discharge, (4) the power to control the servant's conduct, and (5) whether the work is part of the regular business of the employer. *Keitz v. National Paving and Contracting Co.*, 214 Md. 479, 134 A.2d 296 (1957). In *Keitz*, the Court emphasized that the right to control and direct the servant in the performance of his or her work is the key factor to consider.

 Clearly, under the test set forth in *Keitz*, Black was the servant of Equiptec, his general employer. It is also clear from the record that Black installed the air lines based on the directions and instructions given by Morrison of Gencor. Under Maryland law, a servant may at one time be the servant of two employers. A worker may not, however, be a borrowed servant as to some of his duties but not as to others. *Sea Land Industries Inc. v. General Ship Repair*, 530 F.Supp. 550, 565 (D.Md.1982).

We view this case as one where the general contractor simply instructed an employee of the subcontractor how and when to perform one of the tasks that the subcontractor had contracted to perform as part of a larger project and not as an example of the borrowed servant doctrine. This distinction, we believe, is the type that the Supreme Court envisioned in its holding in *Standard Oil.* To hold otherwise would subject contractors to vicarious liability each time one of their employees assisted or cooperated with a subcontractor's worker in the completion work included under an existing contract.[1] Again, however, because of the circumstances of this case, and the equitable

---

1. We note that if a contractor negligently instructs the worker of a subcontractor in the performance of his work, the subcontractor would, of course, have a cause of action or a defense based on the negligence of the contractor. In the present case there is, however, no indication from the record that Morrison of Gencor incorrectly instructed Black concerning the installation of the air line.

grounds upon which it was decided, our observation is not determinative of the outcome.

### III.

██ I.A. Corp. intensely challenges the trial court's finding that the subsequent actions by Gencor personnel during the plant's start-up phase were the direct and continuing causes of the asphalt spill.

At the outset of our analysis of this issue, we note that Equiptec was neither notified nor present when the plant was started-up, nor was it requested to have representatives present.

In his findings related from the bench, the trial judge stated:

> Now, the Defendant claims that there is negligence on the part of the Plaintiff Equiptec, and essentially that relates to the hookup of the air hoses. But we're in equity and we have to do equity when we're in equity. And there are some other things I don't think the Court can ignore....

Our review of the record indicates without question that Gencor took numerous short-cuts prior to and during the start-up phase of plant operations that in all likelihood caused or contributed to the asphalt spill. Among the deficiencies in Gencor's actions cited by the court in concluding that I.A. Corp.'s general contractor was contributorily negligent are the following: The hot oil heating system functioned improperly and caused a "slug" of solid asphalt to be present in the supply pump when the plant began operation (Equiptec had previously made known its concerns to Gencor regarding this system); the safety shut-off switch on the AC bucket, which would have staunched the flow of asphalt by stopping the pump circulating the asphalt, was rendered ineffective by Gencor's use of the unloading pump to circulate the asphalt; Gencor started the plant without checking the position of the air lines and the proper operation of the three-way valve, the air compressor

controlling the valve leading to the air lines, was turned-off; and after starting the plant, Gencor left it unattended for approximately ten hours.

Upon our review of the record, we are convinced that the trial court's decision that Gencor started the plant in a reckless manner is supported by the evidence. There were a number of safety checks and devices that could have avoided this spill even if the air lines had originally been connected improperly. Gencor, not Equiptec, supervised the start-up procedure. Thus, I.A. Corp., through the acts of its general contractor, must bear the responsibility for failing to observe prudent safety steps. Accordingly, we affirm the trial court's ruling, on equitable grounds, that I.A. Corp. was not entitled to decrease the amount of the mechanic's lien by the costs incurred cleaning the asphalt spill.

### IV.

I.A. Corp.'s final assertion of error is that the negligence of Equiptec's employee constituted "fraudulent, illegal or inequitable conduct" sufficient for I.A. Corp. to invoke the doctrine of unclean hands. I.A. Corp. maintains that the trial judge should have refused to hear Equiptec's claim on the ground that it would have been inequitable to do otherwise.

Our review of the record reveals no instance where I.A. Corp. moved the lower court to bar its claim to a mechanic's lien under the doctrine of unclean hands. As I.A. Corp. failed to raise this issue in the court below, we will not address it now for the first time on appeal. Md.Rule 8–131(a).

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.