686 A.2d 665

Alan F. POST, Chartered,

v.

Douglas M. BREGMAN, et al.

No. 1746, Sept. Term, 1995.

Court of Special Appeals of Maryland.

Dec. 24, 1996.

**740**

Roger T. Scully (Andrew Robertson, on the brief), Bethesda, for Appellant.

Glenn M. Cooper (Patricia M. Weaver and Paley, Rothman, Goldstein, Rosenberg & Cooper, Chartered, on the brief), Bethesda, for Appellees.

Argued before CATHELL, DAVIS and EYLER, JJ.

DAVIS, Judge.

Alan F. Post, Chartered, appeals from a grant of summary judgment by the Circuit Court for Montgomery County (Do-

nohue, J.) in favor of Douglas M. Bregman, and Bregman, Berbert & Schwartz (appellees). The circuit court granted summary judgment on the grounds that appellant had breached a contract for the division of fees stemming from litigation in which both had participated. Appellant presents two questions for our review, which we restate as follows:

I. Could a trial court reasonably find the terms of the fee-sharing contract ambiguous?

II. Do the Maryland Rules of Professional Conduct control the interpretation of fee-sharing contracts between attorneys?

We answer both questions in the negative and affirm the circuit court.[1]

## FACTS

In 1988, Stanley W. Taylor was diagnosed with chronic myelogenous leukemia. Upon learning that his condition may have been related to exposure to certain substances while a heavy equipment mechanic with the District of Columbia, he filed a claim for worker's compensation benefits. His first counsel in the benefit litigation withdrew in 1989; in due course, Taylor contacted Bregman. Bregman invited Post to meet with him and Taylor to discuss representation, although his motivation for doing so is disputed.[2] After this meeting,

---

1. Appellant presents a third issue in his brief: whether the circuit court erred in dismissing as moot appellant's Second Amended Complaint for Declaratory Judgment. Our analysis of the issues as we have framed them renders this a relatively minor issue, which we address in footnote 7 *infra*.

2. Appellant suggests that Bregman felt unqualified to represent Taylor, and thus called appellant in on the matter. Appellant contends that Bregman referred Taylor to appellant, and then following the meeting, "Mr. Taylor agreed to retain [appellant]." Appellees phrase the turn of events quite differently in their brief: "After the meeting with the Client, Mr. Post expressed an interest in joining Mr. Bregman in the representation of the client." Appellees maintain that Taylor contacted Post "to get Mr. Post's view of the case (as Mr. Post specialized in personal injury matters) and to determine whether Mr. Post would want to work together with Mr. Bregman on the case."

appellant alone represented Taylor in his worker's compensation claim, to a favorable result. The retainer agreement between appellant and Taylor, signed by Taylor on August 30, 1987, specifies that "Associate counsel may be employed at the discretion of and expense of Alan F. Post, Chartered without any increase in the attorneys' fees to be paid by the client."[3] At the same time, Taylor pursued a separate, third-party action against the manufacturers and suppliers of the products that allegedly caused his injury. Both appellant and appellees were listed as counsel of record during this litigation. This third-party action spawned the fee-sharing agreement between appellant and appellees that is the subject of this appeal.

Alan Post asserted, in an affidavit submitted to the circuit court, that Bregman expressed a "strong interest" in participating actively in the third-party litigation. According to Post, he advised Bregman that he lacked the resources to pursue properly Taylor's claim. Appellees agreed to provide support and assistance, and advanced appellant $2,000 in February 1990. According to Post's affidavit, appellees' failure to provide any further financial support compelled appellant to hire other counsel, namely, Ronald Simon of Connerton, Ray & Simon. From then until its later withdrawal, the Simon firm was lead counsel in the Taylor litigation.

Appellant maintains that Simon, appellant, and Taylor "continued to develop" Taylor's claim, while keeping appellees informed of developments. Appellees, appellant, and Connerton, Ray & Simon agreed to a fee-sharing arrangement, as evidenced by letters sent by appellant to both Bregman and Connerton, Ray & Simon. The letter to Bregman, sent on June 14, 1990, included the following:

> You and I have discussed the active participation of Bregman, Berbert & Schwartz in this case. I have discussed this with Ron Simon and we do feel that there will

---

3. All counsel involved in the Taylor litigation were retained by Taylor under the authority of this clause alone. No other retainer agreement exists between Taylor and any counsel involved in his case.

certainly be opportunities for the use of manpower from your office to handle various pleadings, depositions, etc. Therefore, we have agreed that the firm of Bregman, Berbert & Schwartz will share in the recoveries to the extent of 25% of all fees recovered from the third party litigation.

You will be called upon to contribute 25% of all out-of-pocket expenses and an appropriate allocation of the labors of litigation.

Appellant also drafted a letter to Simon which read, in pertinent part:

... We have agreed that in the case of Stanley Taylor, the referring law firm of Bregman, Berbert & Schwartz will be entitled to 25% of the net fee recovery, provided that they meet their commitment of contributing 25% of costs as well as such litigation related tasks as shall be assigned to them. The law firm of Post and Slattery and Connerton, Ray & Simon will share equally in the net remainder of the fees.

Appellant asserts that the above letters show that the division of fees was premised upon appellees providing proportionate services. Appellees, however, claim that they sent a reply letter on June 21, 1990, which reads, again in pertinent part:

Thank you for your letter dated June 14, 1990, in connection with the [Taylor case].

Your letter correctly states our understanding, subject to some clarification.

First, by way of clarification, our firm's involvement in the third party actions is dependent upon direction from you or Ron Simon. We are excited about working the case with you, but we cannot do work until you delegate. If you do not ask us to do 25% of the work, nevertheless, our fee will still be 25%.

Appellant denies receipt of this letter.

In September 1990, appellant filed three actions in the Superior Court of the District of Columbia, one of which was Taylor's. The three actions were consolidated. Appellant

claims that during the period between December 1990 and April 1991, appellees provided the use of an associate's time to assist appellant in the drafting "of some early discovery" and in obtaining the service addresses of additional defendants named in the amended complaint that appellant had filed. In April 1991, appellant alleges, appellees transferred the associate to other projects. From that point on, continues appellant, appellees performed no further services in the Taylor litigation, and in fact advised appellant that it would not assume any further financial risk in the matter. In October 1991, Simon requested permission to withdraw; at that time, appellant explains, appellees renewed their offer of assistance and volunteered to provide replacement co-counsel. Appellant alleges that appellees never provided the name of any counsel, however, and in fact provided no assistance.

Appellees agree that before Simon's withdrawal, they had advanced $2,000 to appellant, in addition to miscellaneous out-of-pocket expenses, because appellant did not have the resources to cover the costs of litigation. Appellees also direct us to the stipulation by the parties that appellees fully satisfied every request for services made of them, including, *inter alia*, interviewing clients, investigating, drafting discovery, attending a deposition, appearing in court, conducting legal research, and staying up to date on the case. Appellees argue that they had no duty under the contract to perform services or contribute funds until requested to do so.

In fact, many of the services they performed, appellees assert, were done without being requested, and so were above and beyond what the fee-sharing agreement required of them. On several occasions, appellees argue, they called appellant specifically to inquire what else they could do, and were often told that nothing was required. Furthermore, appellees argue, they continued in their role as counsel of record throughout the entire case, receiving pleadings and staying up to date. Appellees conclude by asserting that Taylor was aware both that appellees were co-counsel of record and that they would provide services on Taylor's behalf, by virtue of appellees'

listing as co-counsel on pleadings and court filings provided to Taylor during the litigation.

Appellant does not dispute that appellees received all pleadings and filed documents; rather, appellant maintains that it was responsible for placing appellees on the service list, and that it did so merely as a professional courtesy. Appellant also argues that Taylor was unaware of appellees' involvement in his case until December 1994, when appellant advised him of appellees' claim for forty percent of the fees. Appellant supplemented this claim with an affidavit sworn to this effect by Taylor.

Simon's withdrawal generated a cash flow problem for appellant, and by letter sent December 20, 1991, appellant notified appellees that the firm of Paulson, Nace, Norwind & Sellinger had agreed to become lead counsel for the Taylor litigation, and would fund all of the expenses and perform much of the labor. Consequently, Paulson, Nace insisted on two-thirds of the fees generated by the case, leaving one-third to be divided between the remaining firms. In the December 1991 letter, appellant suggested that it and appellees divide the one-third share between themselves on a 60/40 basis, favoring appellant. Appellees agreed to this modification of the contract. A handwritten notation was also added to the letter, reading "Plus costs, Plus unpaid expenses," which Alan Post and Douglas Bregman initialed. At the conclusion of litigation, appellees presented a demand for payment under the contract. Appellant filed the declaratory action in the circuit court and appellees counterclaimed for breach of contract damages.

The circuit court based its grant of summary judgment on five conclusions. First, it found that it had jurisdiction to rule on the counterclaim, a decision not challenged on appeal. Next, it decided that the pleading was unambiguous in setting forth, "without any ambiguity, what the contract is, how it was breached, and its claim for, in this case, liquidated damages." The court decided that the December 20, 1991 letter comprised the contract, and then concluded that appellant breach-

ed the contract, saying "there is no question of its existence, of who wrote it, of the fact that it was agreed to, and there is, of course, no question of the fact that the money has not been paid."

Finally, the court decided that the proper analytical posture to take in its approach to the case was to treat appellant's claim for declaratory relief as a defense to the enforcement of the contract, and decided as a matter of law that a breach of an ethical rule is not a defense to a claim for breach of contract. Thus, reasoned the circuit court, appellant's complaint for declaratory judgment was moot for lack of a controversy. Appellant filed a timely appeal from the court's judgment.

## STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. MD.RULE 2–501(e) (1996). The non-moving party gets the benefit of all favorable inferences that may reasonably be drawn from the facts. *King v. Bankerd,* 303 Md. 98, 111, 492 A.2d 608 (1985). If any fact, or any inference of fact, is in dispute, and that dispute would affect the outcome of the controversy, then summary judgment is inappropriate. *Id.* This standard is akin to a directed verdict; i.e., whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. *Seaboard Surety Co. v. Richard F. Kline, Inc.,* 91 Md.App. 236, 244, 603 A.2d 1357 (1992). Therefore, the mere existence of a scintilla of evidence in support of the plaintiff's claim is insufficient to avoid a grant of summary judgment. *Id.* at 244–45, 603 A.2d 1357. Moreover, summary judgment is proper even when facts are disputed, if their resolution is not material to the controversy. *Lynx, Inc. v. Ordnance Prods., Inc.,* 273 Md. 1, 8, 327 A.2d 502 (1974). Because the circuit court decides issues of law, not fact, when granting summary judgment, the grant itself is a matter of law, to which an appellate court owes no deference. Our task, rather, is to examine whether

the court was legally correct. *Heat & Power Corp. v. Air Prods. & Chems., Inc.*, 320 Md. 584, 591, 578 A.2d 1202 (1990).

## LEGAL ANALYSIS

### I

The circuit court flatly decided that the contract consisted only of the December 20, 1991 letter, which specified that the parties split 60/40 one-third of the recovery and give two-thirds to Paulson, Nace. In doing so, the court ascribed no importance to the June 1990 letter, which, appellant asserts, was also part of the contract. The December 1991 letter, says appellant, modified the June 1990 letter; it did not replace it. Together, appellant maintains, the two letters comprise the contract. Appellees, for their part, assert no position regarding which of the letters comprise the contract.

 The circuit court erred in assuming no dispute as to which documents comprised the contract between appellant and appellees. Appellant had argued that the June 14, 1990 letter was the original agreement, which the December 20, 1991 letter modified. In an affidavit submitted to the court, Post stated:

7. In June, 1990, after obtaining a promise from the Bregman firm that they would provide financial and professional support to my firm in proportion to a division of fees which would give them Twenty-five percent (25%) of the fees received, they were included in a fee agreement with my firm and Connerton, Ray & Simon.

Appellees do not deny that the June 14, 1990 letter comprised part of the contract, but instead argue that the subsequent letter, sent a week later, modified an agreement which already existed. In his affidavit in support of summary judgment, Douglas Bregman stated, "Through written correspondence between Alan Post and myself, it was understood that Mr. Post was to delegate whatever work he desired my firm to do." Furthermore, in their brief, appellees admit that the June 14, 1990 letter formed part of the contract. In our view,

this satisfies the rule that a party must allege evidentiary facts, rather than mere conclusions, in order to show a genuine dispute of fact. *Hill v. Lewis,* 21 Md.App. 121, 131, 318 A.2d 850, *cert. denied,* 272 Md. 742 (1974).

Our examination of the court's analysis does not end there, however. Although appellant successfully alleged a disputed issue of fact in the court below, the dispute may not be material, and thus cause for reversing the circuit court. Because we review the motion for summary judgment for legal correctness after viewing all factual disputes in the light most favorable to the non-moving party, *see Berkey v. Delia,* 287 Md. 302, 326–27, 413 A.2d 170 (1980), we will assume for the purposes of appeal that the parties intended the June 14, 1990 letter to remain part of the contract, as well as the December 20, 1991 letter. We will further assume that, as it asserts, appellant never received the June 21, 1990 letter from appellees, which appellees claim they sent in order to clarify that they could contribute nothing until called upon to do so.

With the foregoing assumptions in mind, we turn to an analysis of the meaning of the contract. Our paramount consideration is to divine the intent of the parties. *See Heyda v. Heyda,* 94 Md.App. 91, 98, 615 A.2d 1218 (1992). Construction of a contract is, in the first instance, a question of law for the court to resolve. *Suburban Hospital v. Dwiggins,* 324 Md. 294, 306, 596 A.2d 1069 (1991). Interpreting contractual language is a two-step process. *Admiral Builders Sav. & Loan Ass'n v. South River Landing, Inc.,* 66 Md.App. 124, 131, 502 A.2d 1096 (1986). The court must initially determine whether the contract is ambiguous. *Id.* In doing so, the court must analyze the language of the contract based on the plain meaning of the words used. *Id.* at 128, 502 A.2d 1096; *Pacific Indemnity Co. v. Interstate Fire & Casualty Co.,* 302 Md. 383, 389, 488 A.2d 486 (1985); *Shapiro v. Massengill,* 105 Md.App. 743, 755, 661 A.2d 202, *cert. denied,* 341 Md. 28, 668 A.2d 36 (1995). "Where the language of a contract is clear and unambiguous, there is no room for construction and [the court] 'must presume that the parties meant what they expressed.'" *Id.* at 754, 661 A.2d 202 (quoting *Gen'l Motors*

*Acceptance Corp. v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306 (1985)). In such cases, a court may not consider extrinsic evidence of the parties' intent, but must confine its review to the language itself and consider what a reasonable person in the position of the parties would have thought it to mean. *McIntyre v. Guild,* 105 Md.App. 332, 355, 659 A.2d 398 (1995). We review a court's determination of ambiguity in a contract for clear error. *Shapiro,* 105 Md.App. at 755, 661 A.2d 202; *Admiral Builders,* 66 Md.App. at 128–29, 502 A.2d 1096.

The circuit court, in the case *sub judice,* made no specific finding of ambiguity or of clarity with regard to what we assume on review to be the contract. Considering the meaning only of the December 20, 1991 letter, the court concluded that no material dispute of fact existed—that there was "no question of its existence, of who wrote it, of the fact that it was agreed to, and there is, of course, no question of the fact that the money has not been paid." [4] Because the court was only concerned with the December 20, 1991 letter, we do not consider the court's comments to address the actual contract, for purposes of our review. In fact, for purposes of our analysis, the court's comments concerning the December 20, 1991 letter are largely irrelevant, because we assume for the purposes of our review that the contract consisted of both letters.

As a general rule, an appellate court may not sustain a grant of summary judgment on a ground not ruled upon by the trial court, *"if the alternative ground is one as to which the trial court had a discretion to deny summary judgment."* *Geisz v. Greater Baltimore Medical Center,* 313 Md. 301, 314 n. 5, 545 A.2d 658 (1988) (emphasis added). This principle rests upon the rationale that to rule upon an issue not considered by the trial judge would "deprive the judge of discretion to deny or to defer until trial on the merits the

---

4. We note that the circuit court did not expressly indicate that there was no dispute as to what the contract *meant.* The court's language, however, makes clear that it thought the contract unambiguous, a belief made irrelevant as shown *infra.*

entry of judgment on such issues," *id.* (quoting *Henley v. Prince George's County,* 305 Md. 320, 333, 503 A.2d 1333 (1986)), and "is consonant with the rule that a trial judge has discretion to deny a motion for summary judgment so that a more complete factual record can be developed." *Maryland Casualty Co. v. Lorkovic,* 100 Md.App. 333, 357, 641 A.2d 924 (1994). Nevertheless, as the Court of Appeals in *Geisz* indicated, the principle rests equally upon the precondition that the trial court have discretion to deny summary judgment. *Geisz,* 313 Md. at 314, n. 5, 545 A.2d 658; *Maryland Casualty Co.,* 100 Md.App. at 357, 641 A.2d 924. *See also* Md.Rule 2–501(e) ("The court *shall* enter judgment in favor or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law.") (emphasis added).

In *Maryland Casualty Co.,* we affirmed the grant of summary judgment based upon a legal theory not relied upon by the trial court. In doing so, we noted that the portion of the record relevant to the alternate ground had been fully developed in the circuit court, and the trial memoranda for both sides presented detailed analyses of the relevant legal issue. *Maryland Casualty Co.,* 100 Md.App. at 358, 641 A.2d 924. Thus, we concluded, "the trial court had no 'discretion to deny summary judgment' on this 'alternative ground,'" and we affirmed. *Id.* (quoting *Three Garden Village Ltd. Partnership v. United States Fidelity & Guaranty Co.,* 318 Md. 98, 107–08, 567 A.2d 85 (1989)).

In the case *sub judice,* we are not faced with an "alternative ground," at least in the sense of an alternative legal *theory.* *See Maryland Casualty Co.,* 100 Md.App. at 358, 641 A.2d 924 (affirming grant of summary judgment on different legal theory altogether). We apply the same legal theory—contract ambiguity—while expanding our consideration of the underlying factual basis for affirmance to include facts *advantageous* to appellant, which were not considered by the circuit court. In other words, we adopt appellant's argument as to what documents comprised the contract, an argument fully devel-

oped in its Opposition to the Motion for Summary Judgment, in its brief to this Court, and in oral argument before this Court. *See id.* (". . . appellants' trial memorandum and joint appellate brief present a detailed analysis of [the legal issue].").[5]

Adopting the composition of the contract asserted by appellant, however, we find no ambiguity; in fact, we would be constrained to hold any threshold determination of ambiguity in the contract (as asserted by appellant) to be clearly erroneous, based on the evidence produced in the circuit court. *See Shapiro,* 105 Md.App. at 755, 661 A.2d 202 (appellate courts review a trial court's threshold decision of ambiguity under the "clearly erroneous" standard of MD.RULE 8–131(c)). Furthermore, as appellant has made perfectly clear its argument as to the composition of the contract, and as further discovery would shed no light on what we perceive to be the unambiguous meaning of the plain language within, we see no merit in remanding on that basis. Simply put, the circuit court had no "discretion to deny summary judgment" even if it had adopted appellant's composition of the contract. *Maryland Casualty Co.,* 100 Md.App. at 358, 641 A.2d 924. As we said in *Donovan* when faced with a similar situation:

> Moreover, based upon the unrefuted facts established by [appellee], the interlineation of Mrs. Donovan's name was of no effect as a matter of law. Consequently, the trial court was without discretion to deny [summary judgment].

*Donovan,* 100 Md.App. at 418 n. 2, 641 A.2d 961. Here, as in *Donovan,* the change in the underlying factual situation, which we make for the purposes of our review, is of no effect as a matter of law, as we discuss *infra.* Therefore, we must affirm.

---

5. We were faced with much the same situation in *Donovan v. Kirchner,* 100 Md.App. 409, 641 A.2d 961, *cert. denied,* 336 Md. 299, 648 A.2d 202 (1994). In that case, we said that whether the interlineation of a name onto a deed was of any effect was a threshold issue that had been implicitly decided by the trial court before it granted summary judgment. *Id.* at 418 n. 2, 641 A.2d 961. Thus, we were not sustaining the judgment on an "alternative ground," but were reversing one conclusion of the trial court while arriving at the same *legal* decision. *Id.*

■ The relevant language in the June 14, 1990 letter affirms an agreement that appellees would receive twenty-five percent of the fees recovered from the litigation. The "duty clause" of the letter reads: *"You will be called upon to contribute 25% of all out-of-pocket expenses and an appropriate allocation of the labors of litigation."* (Emphasis added). The plain language of the contract, then, specifies that appellees' role in the litigation was a passive one; no duty to contribute would arise until appellees were "called upon." The term "allocation" used in connection with appellees' share of litigation tasks is likewise telling. Black's Law Dictionary (5th ed.1983) defines "allocation" as an "[a]ssignment or distribution of an amount among [something]." Webster's Third New International Dictionary (1986) defines it as "the action of apportioning" and defines "allocate" as "to distribute or to divide and distribute . . . ." Again, the word connotes a passive role envisioned for appellees, an intent that they wait for work to be assigned to them.

■ No other phrase in the two letters relied upon by appellant concerns the tasks appellees were to perform. Appellant asserts in its brief that the phrase in its December 1991 letter, " 'with our assistance success will follow' ", constitutes a "permissible and very reasonable inference" of an intent that appellees contribute proportionately, and therefore summary judgment was improperly granted. We disagree. We see no such intent that could reasonably be inferred from that single clause. A court's determination that a contract is ambiguous must be based upon "substantial evidence," not the merest possibility that one might interpret the contract a certain way. *See Burroughs Int'l Co. v. Datronics Engineers, Inc.*, 254 Md. 327, 338, 255 A.2d 341 (1969).

■ Moreover, to read into that one phrase a requirement that appellees take on duties and costs of their own accord would ignore and even contradict the stronger language requiring them to perform the work allocated to them, and to contribute money and manpower when called upon. A contract must be construed in its entirety and, if reasonably possible, effect must be given to each clause or phrase so that the court does not cast out or disregard a meaningful part of the writing. *Bausch & Lomb Inc. v. Utica Mut. Ins. Co.*, 330

Md. 758, 782, 625 A.2d 1021 (1993). To view the contract as appellant would have us view it would ignore this most basic rule of construction. Moreover, any modicum of ambiguity which may possibly exist by virtue of that one phrase is properly resolved against appellant, as the drafter of the contract at issue. *I.A. Constr. Corp. v. Equiptec, Inc.*, 95 Md.App. 574, 580, 622 A.2d 206, *cert. denied*, 331 Md. 480, 628 A.2d 1067 (1993).

We hold that the contract, read as framed by appellant for the purposes of our review, is clearly unambiguous, and susceptible of only one meaning. A contrary conclusion would be clearly erroneous.[6] Therefore, although the dispute in the case *sub judice*, if meritorious, would certainly be *material*, it is not *genuine*; i.e., appellant's interpretation of the contractual requirements thrust upon appellees is not reasonable, and thus there is no genuine dispute of material fact.

Similarly, appellant's other claims of disputed material fact, made in this Court and in its Response to the Motion for Summary Judgment, fail as well. Given the proper construction of appellees' duties under the contract, issues regarding appellees' actual participation and contribution in the case are immaterial. The parties have stipulated that appellees performed every task they were assigned during the Taylor litigation, and appellant never alleged that appellees refused to contribute funds to the litigation expenses whenever asked to do so. In fact, appellees contributed $2,000 toward ex-

---

6. Appellant's June 14, 1990 letter to Ronald Simon properly forms no part of the contract between the parties. In the *initial determination of ambiguity*, however, "extrinsic evidence need not be excluded from the trial court's consideration (so long as that evidence does not vary, alter, or contradict the plain meaning of the writing) because, until the evidence is heard, ambiguity or the lack thereof cannot be fully appreciated." *Admiral Builders*, 66 Md.App. at 129, 502 A.2d 1096. With this in mind, we think the letter to Ronald Simon sheds further light on the clarity of the language used in the contract between appellees and appellant. In that letter, appellant informs Simon that appellees would receive twenty-five percent of the recovery, "provided that they meet their commitment of contributing 25% of costs *as well as such litigation related tasks as shall be assigned to them.*" (Emphasis added). Appellant offers no evidence to support a finding of ambiguity which would not contradict the plain meaning of the contract.

penses at the very beginning of the case, which has never been reimbursed.

The remaining issues raised by appellant concern the impact of the Maryland Rules of Professional Conduct on the interpretation of an unambiguous contract. We now turn to that issue.

## II

Appellant argues that compliance with Rule 1.5(e) of the Maryland Rules of Professional Conduct is implied in every fee-sharing agreement between attorneys in Maryland. That rule reads as follows:

**Rule 1.5. FEES.**

(e) A division of fees between lawyers who are not in the same firm may be made only if:

(1) the division is in proportion to the services performed by each lawyer or, by written agreement with the client, each lawyer assumes joint responsibility for the representation;

(2) the client is advised of and does not object to the participation of all the lawyers involved; and

(3) the total fee is reasonable.

This Rule, appellant maintains, reflects a public policy which forms a foundation for any bargain between attorneys. Citing various cases from foreign jurisdictions, appellant argues that the ethical rules do not exist in a vacuum, but operate to govern all disputes between lawyers. In support of this proposition, appellant invokes the general rule in Maryland that parties to a contract are presumed to contract mindful of existing law and that all relevant laws, including judicial precedent, are read into the agreement just as if expressly provided by them. *See, e.g., Wright v. Commercial & Sav. Bank*, 297 Md. 148, 153, 464 A.2d 1080 (1983). The Rules of Professional Responsibility, argues appellant, are the equivalent of judicial precedent, and thus inhere in all agreements between counsel. Therefore, appellees' demand for a share of the fees disproportionate to the services they performed, as it violated Rule 1.5(e), violate the contract.

■ To evaluate appellant's argument, we begin with standard rules for the construction of contracts. As discussed *supra*, the agreement between the parties is unambiguous, and in such a case, we presume the parties to mean what they say. *See Shapiro*, 105 Md.App. at 754, 661 A.2d 202. "The cardinal rule in the construction of contracts is that effect must be given to the intent of the parties, unless that intent is inconsistent with some established principle of law." *McIntyre*, 105 Md.App. at 355, 659 A.2d 398. All other rules of construction only supplement that "cardinal rule." *Bentz v. Mut. Fire, Marine & Inland Ins. Co.*, 83 Md.App. 524, 538, 575 A.2d 795 (1990). In this case, the parties said that appellees would receive forty percent of one-third of the fees, as long as they performed the duties delegated by appellant or others. As discussed *supra*, that was the parties' intent as divined from the plain meaning of the contractual language. If we were to hold Rule 1.5(e) applicable to this contract in the manner appellant suggests, then assuming, *arguendo*, appellees' interpretation would violate the rule (an assumption upon which appellant depends), the plain language of the contract could not hold. As a result, we would be constrained to hold an unambiguously worded contract to be ambiguous solely by the operation of an ethical rule, and to read Rule 1.5(e) into the contract even if the language runs squarely against the rule. In short, appellant asks us to adopt a bright-line rule of construction mandating compliance with Rule 1.5(e) no matter how clear and unambiguous the language of the contract.

We are convinced, as appellant asserts, that appellant does not rely on the Rules as a *defense* to a breach of contract action.[7] Rather, appellant invokes the proposition first articulated in *Von Hoffman v. Quincy*, 71 U.S. (4 Wall.) 535, 550, 18 L.Ed. 403 (1866)—that parties to an agreement are deemed to have contracted with knowledge of existing law, and that "the laws which subsist at the time and place of the making of a contract ... enter into and form a part of it, as if they were expressly referred to or incorporated in its terms." *Id., quoted in Wilmington Trust Co. v. Clark*, 289 Md. 313, 320,

---

7. Because we agree with appellant that the circuit court inaccurately framed appellant's argument as a defense to a breach of contract

**758**

424 A.2d 744 (1981); *see also, e.g., Heyda,* 94 Md.App. at 98, 615 A.2d 1218.

 Maryland has never held the Rules of Professional Conduct applicable to actions in contract. Statutes, of course, are law for the purposes of interpreting contracts, *see Wright,* 297 Md. at 153, 464 A.2d 1080, as are regulations. *Heyda,* 94 Md.App. at 98, 615 A.2d 1218. The Rules of Professional Conduct, however, govern the conduct of lawyers in an effort to maintain the integrity of the legal profession. *See Maryland St. Bar Ass'n v. Agnew,* 271 Md. 543, 549, 318 A.2d 811 (1974) ("Disciplinary procedures have been established ... not for punishment, but rather as a catharsis for the profession and a prophylactic for the public."). Appellant's attempt to link the Rules of Professional Conduct and "law" which is presumed a part of every contract as if expressly provided for in its terms is grounded upon a misconception of the proper role that the Rules of Professional Conduct play in our society.

 It is necessary first to recall the principle restated by the Court of Appeals in *Attorney Gen. of Maryland v. Waldron,* 289 Md. 683, 426 A.2d 929 (1981), that "in addition to the specific powers and functions expressly granted to the three organs of government by the Constitution, each branch possesses additional powers perforce implied from the right and obligation to perform its constitutional duties." *Id.* at 690, 426 A.2d 929 (citations omitted). As the Court further explained:

Cognizant of the constitutionally imposed responsibility with respect to the administration of justice in this State, this Court has heretofore recognized and held that the regulation of the practice of law, the admittance of new members to the bar, and *the discipline of attorneys who fail to conform to the established standards governing their professional conduct are essentially judicial in nature* and, accordingly, are encompassed in the constitutional grant of judicial authority to the courts of this State.

---

action, we agree that the court erred in dismissing appellant's declaratory claim as moot. The error is not prejudicial, however, as we decide against appellant on the issue presented in its claim for declaratory relief.

*Id.* at 692, 426 A.2d 929 (emphasis added) (citations omitted). This power springs from the fierce protection that the judicial branch must exercise of its ability to govern itself free from interference by the legislature. Quoting with approval the Supreme Judicial Court of Massachusetts, the Court stated in *Maryland State Bar Ass'n v. Boone,* 255 Md. 420, 258 A.2d 438 (1969):

It is a necessary implication from the exclusive jurisdiction of the judicial department of control of membership in the bar that the judicial department is not restricted in the [manner] of review in such proceedings to methods prescribed by statute. If this were not true the judicial department would be restricted by legislative action in the performance of its duties with respect to membership in the bar of which it has "exclusive cognizance."

*Id.* at 431, 258 A.2d 438. Thus, the Court has drawn a clear distinction between legislative enactments and the legislature in general and rules passed by the judiciary for the purpose of regulating the conduct of attorneys. In light of this separation, we cannot place our imprimatur on the proposition that the Rules of Professional Conduct are "laws" to be read into each contract, as appellant maintains.[8]

Appellant, however, does not rest its argument there, but characterizes the Rules as "judicial precedent," which, appel-

---

**8.** The Rules of Professional Conduct are law—and are legislative in nature—when adopted within their authorized scope. MARYLAND CONST. art. IV, § 18 (rules adopted by the Court of Appeals have the force of law); *Cardinall v. State,* 335 Md. 381, 387, 644 A.2d 11 (1994); *Ginnavan v. Silverstone,* 246 Md. 500, 505, 229 A.2d 124 (1967); *Gantt v. State,* 109 Md.App. 590, 597, 675 A.2d 581 (1996); *Carbaugh v. State,* 49 Md.App. 706, 708, 435 A.2d 116 (1981), *overruled in part on other grounds, Walczak v. State,* 302 Md. 422, 488 A.2d 949 (1985); *Kohr v. State,* 40 Md.App. 92, 96, 388 A.2d 1242 (1978). As we discuss *infra,* the note on Scope makes it clear that the rules should not be deemed a part of every contract as contemplated by the *Von Hoffman* rule. To do

**760** 

lant argues, also find their way automatically into each contract under the *Von Hoffman* rule. *See Denice v. Spotswood I. Quinby, Inc.*, 248 Md. 428, 433, 237 A.2d 4 (1968) (citing 17A C.J.S. *Contracts* § 330 (1963)). This conclusion, says appellant, follows quite naturally from the recognition that the Rules "constitute, as opinions do, proclamations of the judiciary." These rules, appellant concludes, should "inform and be implied in all agreements between counsel."

We note initially that appellant cites no cases—and we have found none—that concern a situation calling for the automatic incorporation of judicial precedent into a contract. Rather, all the cases that appellant cites deal with statutes, regulations, and ordinances. *See, e.g., Wright v. Commercial & Sav. Bank*, 297 Md. 148, 464 A.2d 1080 (1983) (concerning application of the Commercial Law and Financial Institutions Article of the Maryland Code); *State, Dep't of General Services v. Roger E. Holtman & Assoc., Ltd.*, 296 Md. 403, 463 A.2d 803 (1983) (§§ 7–101 to 7–104 of Article 21 of the Maryland Code (1957, 1981 Repl.Vol.) must be considered as part of a contract between an individual and the State); *Wilmington Trust Co. v. Clark*, 289 Md. 313, 424 A.2d 744 (1981) (refusing to apply the Maryland Criminal Code to a separation agreement); *Dennis v. Rockville*, 286 Md. 184, 406 A.2d 284 (1979) (a city ordinance forms part of the terms of a contract if passed before the making of the contract); *Beca v. Baltimore*, 279 Md. 177, 367 A.2d 478 (1977) (police regulations read into employment contract of police officer); *Denice*, 248 Md. at 433, 237 A.2d 4 (Montgomery County Ordinance is read into home construction contract). In view of this, we are reluctant to hold that judicial precedent should be read into each contract as if expressly provided for, in the manner of statutes, ordinances, and regulations.

 We do not have to decide this issue, however; rather, we hold that the Maryland Rules of Professional Conduct are not "judicial precedent," even if judicial precedent were included in the *Von Hoffman* rule. The conclusion that both judicial opinions and the Rules are "judicial precedent" is a *non*

---

so would extend the rules beyond their "authorized scope." *See, e.g., Gantt,* 109 Md.App. at 597, 675 A.2d 581.

*sequitur* to the observation that both constitute "proclamations of the judiciary," as appellant maintains. The two merely share a non-determining characteristic. Appellant presupposes that all judicial proclamations constitute judicial precedent. In this, appellant is in error.

The importance of judicial precedent is found in the principle of *stare decisis*, which directs courts to avoid disturbing previous decisions unless the rule espoused within has become unsound and no longer suitable for society. *Harrison v. Montgomery County Bd. of Ed.*, 295 Md. 442, 459, 456 A.2d 894 (1983). This is a rule of policy born of the notion that precedents and practice are to be viewed, "not as *making* the law, but as evidence of what it has been supposed to be from the earliest times." *Weighorst v. State*, 7 Md. 442, 453 (1855) (emphasis added). From such notions we, as a society, take the great comfort of knowing what the law is, and what we reasonably can expect it to be in the future. A corollary to this principle is the view that the most basic function of the judiciary is to "say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803), rather than to make new law. That function is for the legislature, as specified by the separation of powers inherent in our constitutional system. In other words, "judicial precedent" is a phrase that refers to the slow and deliberate *interpretation* of already existing law, rather than the creation of new law. Therefore, the term is inappropriately applied to the rules set forth by the Court of Appeals to govern the conduct of attorneys or the procedures of the courts, as by their very nature these rules do not originate from the legislature or the common law, but are promulgated at the initiative of the Court of Appeals. Put another way, the Court of Appeals may change the Rules of Professional Conduct at any time, a power which runs squarely against the very definition of *stare decisis* and "judicial precedent."

Finally, we look to the Rules themselves, particularly the introductory note on Scope, which offers substantial sup-

port for our conclusion that the *Von Hoffman* rule not extend to the Rules of Professional Conduct:

> Furthermore, the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons. The fact that a Rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, *does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule. Accordingly, nothing in the Rules should be deemed to augment any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such a duty.*

(Emphasis added). The text of each Rule is authoritative, and the Preamble and the note on Scope provide a "general orientation." The language used is directly on point. Both appellant's declaratory action and appellees' counterclaim are collateral proceedings, and interpreting the contract between the two in light of Rule 1.5(e) clearly would "augment ... extra-disciplinary consequences of violating" the Rule.

In reaching our conclusion, we are mindful of our discussion *supra*, wherein we illustrated the constitutional basis for the judiciary's power to regulate itself. *See, e.g., Waldron*, 289 Md. at 690, 426 A.2d 929. Such a power is necessary for the courts to "maintain their dignity, transact their business, [and] accomplish the purposes of their existence...." *Id.* at 691, 426 A.2d 929 (quoted source omitted). Precisely because of this high degree of self-regulation, the judiciary must be extremely careful not to abuse its autonomy by extending the application of the rules it promulgates into areas not within its primary authority. In our view, the enforceability in contract of fee-sharing agreements between attorneys is one such area.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**